NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| In re: | : | Bankruptcy Case No. 03-51524 |
| | : | |
| CONGOLEUM CORPORATION, et al., | : | Chapter 11 |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | Hearing Date: May 12, 2008 |
| | : | Document Number 6449 |

**OPINION RESOLVING MOTIONS AND CROSS MOTION FOR SUMMARY
JUDGMENT ON CONFIRMATION OF JOINT PLAN OF REORGANIZATION
DATED AS OF FEBRUARY 5, 2008**

On March 23, 2008, this Court entered an "Order Scheduling Summary Judgment Motions With Respect To Confirmation Of The Joint Plan". That Order identified the following issues to be decided:

> 1) whether the Joint Plan's treatment of various current and future asbestos claimants violates the Bankruptcy Code;
>
> 2) whether the Joint Plan complies with Sections 524(g)(2)(B)(i)(II)-(III) of the Bankruptcy Code with respect to the funding of the Plan Trust and its majority ownership of the Debtors;
>
> 3) whether the release and exculpation provisions of the Joint Plan are consistent with the requirements of the Bankruptcy Code and other applicable law;
>
> 4) whether Section 5.14(h) of the Joint Plan complies with Section 1129(a)(4) of the Bankruptcy Code;
>
> 5) whether the anti-assignment provisions in the Debtors' insurance policies are preempted by federal bankruptcy law; and
>
> 6) whether the Plan or any Plan Documents impermissibly alter the Insurers' rights under the Debtors' insurance policies.

On June 5, 2008, this Court issued an opinion that found that the Joint Plan dated February 5, 2008 was unconfirmable as a matter of law. The June 5, 2008 opinion addressed summary judgment issues one, three, and four. The parties have requested that the Court address the remaining three issues to aid the Plan Proponents in proposing a final plan of reorganization. Accordingly, the Court issues this opinion pursuant to Fed. R. Civ. Pro. 52(b) to supplement its opinion of June 5, 2008.

**A. Whether the anti-assignment provisions in the Debtors' insurance policies are preempted by federal bankruptcy law**

The Joint Plan proposed to transfer all Asbestos Insurance Policies to the Plan Trust. The Insurers whose policies contain an anti-assignment clause have objected to that treatment. Resolution of this issue involves the doctrine of preemption. The doctrine of federal preemption is rooted in the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, which

2

invalidates state laws that "interfere with, or are contrary to, federal law." <u>Hillsborough County v. Automated Med. Labs.</u>, 471 U.S. 707, 712 (1985) (internal quotations omitted). It is well established that federal preemption of state law is disfavored. *See, e.g.,* <u>DeBuono v. NYSA-ILA Med. & Clinical Servs. Fund</u>, 520 U.S. 806, 813 (1997)(noting the "normal presumption against pre-emption"); <u>Fellner v. Tri-Union Seafoods, LLC</u>, – F.3d – , 2008 WL 3842925 (3d Cir. August 19, 2008). As a result, the Plan Proponents bear the "considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.'" <u>DeBuono</u> (quoting <u>New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.</u>, 514 U.S. 645, 654 (1995)).

### i) The <u>Combustion Engineering</u> decision

In 2004, the Third Circuit Court of Appeals denied confirmation of Combustion Engineering, Inc.'s plan of reorganization. <u>In re Combustion Engineering, Inc.</u>, 391 F.3d 190 (3d Cir. 2004). Many of the objections to confirmation of that plan are similar to the objections being raised here. In the Combustion bankruptcy, the London Market Insurers raised as an objection to confirmation that the Plan impaired its rights under the anti-assignment provisions of certain of its insurance policies. The Court of Appeals overruled that objection and found that "Section 541 effectively preempts any contractual provision that purports to limit or restrict the rights of a debtor to transfer or assigns [sic] its interest in bankruptcy ...." <u>Combustion</u> at 219 n. 27. The <u>Combustion</u> court went on to state that the "Bankruptcy Code expressly contemplates the inclusion of debtor insurance policies in the bankruptcy estate" citing 11 U.S.C. § 1123(a)(5). <u>Id.</u>

In this case, the Insurers urge this Court to find that the <u>Combustion</u> decision is not controlling on the preemption issue. The Insurers' primary argument is that the <u>Combustion</u> decision focused on § 541, while here the Insurers do not object to the insurance policies being

included in the bankruptcy estate under § 541, they object to the policies being transferred to the Plan Trust. That argument is unpersuasive because it miscasts the objection the London Market Insurers raised in the Combustion case. The London Market Insurers' objection was to confirmation of the plan, and the plan at issue provided for the insurance policies to be transferred to an asbestos trust, as opposed to the insurance policies simply remaining property of the bankruptcy estate. Transfer of the policies to the asbestos trust could be accomplished only through § 1123(a)(5) and not merely § 541(c)(1), therefore, the Court of Appeals' decision must have been predicated on § 1123(a)(5) in addition to § 541(c)(1). Any other conclusion would make the Combustion opinion's citation to § 1123(a)(5) nonsensical. Combustion at 219 n. 27.

Although the Combustion opinion does not explicitly discuss the interplay between § 541 and § 1123, a close reading of the opinion reveals that the Combustion court's resolution of the London Market Insurers' objection necessarily involved a two stage analysis. The first stage required a determination of whether the insurance policies could become property of the estate despite the inclusion of anti-assignment provisions. That determination turned on § 541, which provides that "an interest of the debtor in property becomes property of the estate ... notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law - (A) that restricts or conditions transfer of such interest by the debtor ...." 11 U.S.C. § 541(c)(1). The second stage required a determination of what could be done with the insurance policies once they were property of the estate. That determination turned on § 1123, which provides that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall ... provide adequate means for a plan's implementation, such as ... transfer of all or any part of the property of the estate to one or more entities ...." 11 U.S.C. § 1123(a)(5). Once the Combustion court defined the term "property of the estate" as used in § 1123 to include insurance policies that contain anti-assignment provisions, then

4

the transfer of those policies to a trust is expressly provided for by § 1123(a)(5)[1].

Accordingly, the Court is unpersuaded by the argument that Combustion does not control here. This Court agrees with the other courts in this Circuit that have concluded that a plan of reorganization may assign insurance policies to a personal injury trust despite the existence of anti-assignment clauses in those policies. *See, e.g.,* In re Kaiser Aluminum Corp., 343 B.R. 88 (D. Del. 2006); In re Federal-Mogul Global Inc., 385 B.R. 560 (Bankr. D. Del. 2008); Hartford Accident and Indemnity Co. v. Global Industrial Technologies, Inc., Civ. Action No. 07-1749 (July 25, 2008) (slip op.).

**ii) Preemption doctrine**

Even if Combustion were not controlling on this issue, the Court would still find that the transfer of insurance policies to a § 524(g) plan trust is permissible based on general preemption principals. The preemption doctrine is rooted in early Supreme Court decisions that interpreted the Supremacy Clause of the United States Constitution to mean that state laws that "interfere with, or are contrary to," federal law are invalid. *See, e.g.,* Gibbons v. Ogden, 22 U.S. 1, 211 (1824). Since that time, the Supreme Court has recognized three overarching types of preemption: "(1) 'express' preemption, applicable when Congress expressly states its intent to preempt state law; (2) 'field' preemption, applicable when 'Congress' intent to pre-empt all state law in a particular area may be inferred [because] the scheme of federal regulation is sufficiently comprehensive' or 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws

---

[1]The Court does not find that Integrated Solutions Inc. v. Service Support Specialties, Inc., 124 F.3d 487 (3d Cir. 1997) compels a different result. First, that case is distinguishable because it addressed the preemptive effect of §§ 704(1) and 363(b)(1) rather than § 1123. Second, Integrated was decided seven years before Combustion and therefore this Court must assume that the Court of Appeals was aware of it when it decided Combustion and simply did not find it relevant to its analysis.

on the same subject;' and (3) 'conflict' preemption, applicable when 'state law is nullified to the extent that it actually conflicts with federal law,' even though Congress has not displaced all state law in a given area.'" Colacicco v. Apotex Inc., 521 F.3d 253, 261 (3d Cir. 2008) (internal citations omitted). Of the three types of federal preemption, two are applicable in this case.

First, the Court finds that the language of § 1123(a) provides for express preemption. The introductory provision of § 1123(a) uses the phrase "[n]otwithstanding any other applicable nonbankruptcy law". 11 U.S.C. § 1123(a). The Supreme Court has observed that the term "notwithstanding" is a clear statement of intent "to supersede all other laws." Cisneros v. Alpine Ridge Group, 508 U.S. 10, 19 (1993). The Courts of Appeals have generally viewed similar 'notwithstanding' language as strong evidence of intent to preempt other law. *See, e.g.,* Liberty Maritime Corp. v. United States, 928 F.2d 413, 416 (Fed. Cir. 1991). In interpreting the phrase "[n]otwithstanding any other provision of law" in § 709(e) of the Technician Act, the Court of Appeals for the Third Circuit held that the phrase must be read to override any conflicting provision of law in existence at the time that the Technician Act was enacted. New Jersey Air Nat. Guard v. Federal Labor Relations Authority, 677 F.2d 276, 283 (3d Cir. 1982). That court found that "the preemptive language is powerful evidence" of Congressional intent, and that a "clearer statement [of intent to preempt] is difficult to imagine." Id. In light of the introductory language in § 1123(a), the presumption against preemption is easily surmounted. Egelhoff v. Egelhoff ex rel. Breiner, 532 U.S. 141, 151 (2001) ("presumption can be overcome where ... Congress has made clear its desire for pre-emption."); *see also,* Sprietsma v. Mercury Marine, 537 U.S. 51, 62-63 (2002) (where federal statute contains preemption clause, court "must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.").

The Third Circuit Court of Appeals has specifically mentioned the prefatory language of § 1123(a) as an example of express preemption. Integrated Solutions, Inc. v. Service Support Specialties, Inc.,124 F.3d 487 (3d Cir. 1997). In Integrated, the Court of Appeals found that a trustee lacked the ability to sell a pre-judgment tort claim because New Jersey law restricted the transfer of such claims. Id. The Court stated the basic proposition that: "unless federal bankruptcy law has specifically preempted a state law restriction imposed on property of the estate, the trustee's rights in the property are limited to only those rights that the debtor possessed pre-petition. In other words, without explicit federal preemption, the trustee does not have greater rights in the property of the estate than the debtor had before filing for bankruptcy. *See*, L. King, Collier on Bankruptcy, ¶ 541.04" Integrated Solutions, Inc. v. Service Support Specialties, Inc.,124 F.3d 487, 492-93 (3d Cir. 1997). Significantly for this case, the Court of Appeals then went on to list instances in the Bankruptcy Code where express federal preemption was provided for; § 1123(a) was among the examples. In rejecting the trustee's argument that § 363(b)(1) and/or § 704(1) provided the authority to preempt state law, the Court stated:

> The clear lack of Congressional intent to preempt state law restrictions on transferring property of the estate is even more telling given the explicit language that Congress uses when it intends to displace state nonbankruptcy law in other provisions of the Bankruptcy Code. See, e.g., **11 U.S.C. § 1123(a) ("Notwithstanding any otherwise applicable nonbankruptcy law, a [reorganization] plan shall ...")**; 11 U.S.C. § 541(c)(1) ("[A]n interest of the debtor in property becomes property of the estate ... notwithstanding any provision in ... applicable nonbankruptcy law (A) that restricts or conditions transfer of such interest by the debtor ..."); 11 U.S.C. § 728(b) ("Notwithstanding any State or local law imposing a tax on or measured by income, the trustee shall make tax returns of income ... only if [the] estate or corporation has net taxable income for the entire period after the order for relief under this chapter during which the case is pending."); 11 U.S.C. § 363(l) ("Subject to the provisions of section 365, the trustee may use, sell, or lease property under subsection (b) or (c) of this section ... notwithstanding any provision in ... applicable law that is conditioned on the insolvency or financial condition of the debtor ...").

Integrated, 124 F.3d at 493 (emphasis added). Accordingly, the Court finds that the assignment of the insurance policies to the § 524(g) trust is permissible under the express preemption doctrine.

Second, the Court finds that conflict preemption is also applicable here. The Supreme Court has identified two types of conflict preemption: (1) where "it is impossible for a private party to comply with both state and federal requirements," and (2) where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." English v. General Elec. Co., 496 U.S. 72, 79 (1990) (internal citations omitted). The first type of conflict preemption is not implicated here because the Plan Proponents could comply with both the anti-assignment provisions of the insurance policies and the Bankruptcy Code simply by proposing a plan that does not transfer any insurance assets to the § 524(g) trust. The question thus becomes: would limiting the Plan Proponents to such a plan invoke the second type of conflict preemption because it is creating an obstacle to the accomplishment of Congressional goals?

To answer that question the Court must examine the stated objectives of Congress in enacting § 524(g) of the Bankruptcy Code. Section 524(g) was added to the Code as part of the Bankruptcy Reform Act of 1994 to help companies deal with the "flood of asbestos lawsuits" they were facing. HR Rep. 103-834, 103rd Cong., 2nd Sess. 8-12 (Oct. 4, 1994); 140 Cong. Rec. H10765 (Oct. 4, 1994). The legislative history of § 524(g) makes clear that it was modeled on the injunction/trust mechanism pioneered in the Johns-Manville bankruptcy case. The House Report specifically notes that the assets contributed to the Johns-Manville trust consisted of "stock of the emerging debtor company and a portion of future profits, along with contributions from Johns-Manville's **insurers**." HR Rep. 103-834, 103rd Cong., 2nd Sess. 8-12 (Oct. 4, 1994) (emphasis added). So, from the very inception of § 524(g) it was understood that insurance assets are often an important component of the assets a debtor has available to contribute to a § 524(g) trust.

Moreover, section 524(g) places an affirmative obligation on a debtor to place "its assets or income" into the trust to enable the trust "to pay claims and demands." 11 U.S.C. § 524(g)(2)(B)(i)(IV). If the anti-assignment provisions in insurance contracts were not preempted by § 1123, then debtors would be prevented from contributing what is often their most significant assets to the § 524(g) trust. Such a result is clearly at odds with the expressed intent of Congress to create a trust that will not only relieve debtors from a flood of asbestos liability, but also provide a reliable source of payment for present and future asbestos claimants. The doctrine of conflict preemption instructs that where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress", then the state law must give way to federal law. English v. General Elec. Co., 496 U.S. 72, 79 (1990). In this instance, that means that anti-assignment provisions in insurance policies, which are enforceable under state law, must give way to § 1123 of the Bankruptcy Code, which allows transfers of property of the estate in order to implement a plan of reorganization.

An actual conflict can also be found based on the Insurers' own arguments. Many of the Insurers argue that under state law a transfer of the relevant insurance policies would be prohibited absent the insurers' consent. *CNA Preliminary Objection* at 17 ("The Debtors' proposed assignment of insurance rights under the Joint Plan is invalid under New Jersey law.") By contrast, this Court has found that the Bankruptcy Code permits the assignment of the insurance policies notwithstanding the lack of consent from the Insurers. That situation presents an actual conflict of state and federal law, thus invoking the doctrine of conflict preemption.

### iii) limitations on preemption under § 1123(a)(5)

The Insurers argue that the express language of § 1123(a)(5) makes clear that it does not preempt private contracts. The introductory provision of § 1123(a) uses the phrase

9

"[n]otwithstanding any other applicable nonbankruptcy law". Thus, the Insurers want this Court to conclude that § 1123 applies to only government laws and not contracts or agreements between private parties. At first glance, that is a persuasive argument. For example, First State's objection points to other sections of the Bankruptcy Code in which specific reference is made to private agreements, *e.g.*, 541(c)(1) ("notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law") and § 1124(2) ("notwithstanding any contractual provision or applicable law"). *First State Preliminary Objection* at 29; *see also*, 2A N. Singer, SUTHERLAND ON STATUTES AND STATUTORY CONSTRUCTION § 46:06, p. 194 (6th ed. 2000) ("The use of different terms within related statutes generally implies that different meanings were intended"). The force of that argument is undercut, however, by other examples in the Bankruptcy Code where private contracts, although not specifically delineated, were clearly intended to be covered by the phrase "applicable nonbankruptcy law", *e.g.*, § 365(c)(3) (prohibits a trustee from assuming a lease that has been "terminated under applicable nonbankruptcy law prior to the order for relief") and § 1322(c)(1) (Chapter 13 plan may extend payment date on mortgage "notwithstanding ... applicable nonbankruptcy law"). So the Insurers' statutory interpretation argument, standing alone, cannot carry the day.

Also cutting against the Insurers' interpretation is the fact that it would render several subsections of § 1123(a) a nullity, a result that courts are cautioned to avoid when interpreting statutes. *See*, Pennsylvania Dept. of Public Welfare v. Davenport, 495 U.S. 552, 562 (1990) (expressing "deep reluctance" to interpret statutory provisions "so as to render superfluous other provisions in the same enactment"). Several of the subsections of § 1123(a) are directed at what are clearly contractual issues, *e.g.*, § 1123(a)(F) ("cancellation or modification of any indenture or similar instrument"); § 1123(a)(H) ("extension of a maturity date or a change in an interest rate or

10

other term of outstanding securities"); and § 1123(I) (amendment of the debtor's charter"). To read the "notwithstanding" phrase as exclusively preempting laws and not contracts and agreements would render those provisions meaningless.

Finally, many courts, including the Third Circuit Court of Appeals, disagree with the Insurers' restrictive reading of § 1123. For example, the Fourth Circuit Court of Appeals held in an analogous situation that:

> § 1123(a)(5) is an empowering statute. As stated by Collier: "The alternatives set forth in § 1123(a)(5) are self executing. That is, the plan may propose such actions notwithstanding nonbankruptcy law or **agreements**." 5 Collier on Bankruptcy ¶ 1123.01, at 1123-10. Section 1123(a)(5)(D) then does not simply provide a means to exercise the debtor's pre-bankruptcy rights; it enlarges the scope of those rights, thus enhancing the ability of a trustee or debtor in possession to deal with property of the estate.

In re FCX, Inc., 853 F.2d 1149, 1155 (4th Cir. 1988) (emphasis added). In the same vein, the Third Circuit Court of Appeals cited § 1123(a)(5)(H) to support its finding that "the plain terms of the Bankruptcy Code refute the proposition that a plan may not extend the maturity date of a mortgage." In re Indian Palm Assocs., Ltd., 61 F.3d 197, 209 (3d Cir. 1995). Accordingly, the Court is unpersuaded by the argument that contracts and agreements should be excluded from the preemptive scope of § 1123(a).

Insurers additionally argue that this Court should follow the rationale of In re Pacific Gas & Electric Co. v. Cal. ex rel. Cal. Dep't of Toxic Substances Control, 350 F.3d 932 (9th Cir. 2003). In that opinion, the Ninth Circuit Court of Appeals held that the meaning of the phrase "nonbankruptcy law" in § 1123(a) should be understood to be co-extensive with § 1142(a). As a result, § 1123(a) would preempt only nonbankruptcy laws "relating to financial condition". PG&E, 350 F.3d at 934-35.

As evidenced by the opinion of the bankruptcy court, part of the rationale underlying the

11

Ninth Circuit's decision in PG&E was clearly a fear of what might result from unfettered preemption in § 1123(a). *See*, In re Pacific Gas & Elec. Co., 273 B.R. 795, 806 (Bankr. N.D. Cal. 2002) ("a plan could provide for a debtor to sell liquor to minors (notwithstanding state laws to the contrary), or trade with foreign enemies (notwithstanding federal statutes to the contrary), or dump toxic wastes (notwithstanding environmental laws and Supreme Court precedent), or merge with competitors to create a monopoly or gain some other competitive advantage (in violation of state or federal antitrust laws)"). Such a fear is unfounded. The PG&E court failed to consider that while § 1123 controls the contents of a plan, a plan cannot be confirmed unless it meets the requirements of § 1129. One of those requirements is that a plan be proposed in good faith. 11 U.S.C. § 1129(a)(3). No bankruptcy court would confirm a plan that called for a debtor to indiscriminately flaunt other laws if it served no legitimate bankruptcy purpose. The fear of the "parade of horribles" that might result from a plan language reading of § 1123(a) is insufficient reason to graft the requirements of § 1142(a) onto § 1123(a) when the plain text of the statute does not support that result. Therefore, the Court is not persuaded to follow that decision (even if it did not conflict with the Third Circuit's ruling on the issue).

Accordingly, the Court finds in favor of the Plan Proponents on their cross-motion for summary judgment on this issue.

**B. Whether the Plan or any Plan Documents impermissibly alter the Insurers' rights under the Debtors' insurance policies**

The Court is mindful that there is a proposed settlement in the Omnibus Avoidance action. Because some of the Insurers' arguments are potentially mooted by the proposed settlement, the Court will not rule on objections tied to the pre-petition settlement agreements. The remaining arguments can be grouped into three classes: 1) that the Joint Plan and/or Plan documents impair

12

the Insurers' contractual rights to cooperation from the Debtors, and to control the resolution of claims; 2) that the Joint Plan eliminates the Insurers right to object to claims pursuant to § 502(a); and 3) that the Joint Plan impairs the rights of non-settling insurers to assert claims for contribution against settling insurers. As a result, the Insurers argue that the Joint Plan is unconfirmable under § 1129(a)(1) and (a)(3).

The basis for the first class of objection can be illustrated by the "Assistance and Cooperation" clause in a Travelers' and St. Paul's insurance contract, which provides:

> Aetna Casualty shall have the right and shall be given the opportunity to associate with the Insured or the Insured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding where the claim or suit involves or appears reasonably likely to involve Aetna Casualty, in which event Insured and Aetna Casualty shall cooperate in all things in the defense of such claim, suit or proceeding.

*Travelers Objection* at 29 n. 23. The Plan Proponents concede that this clause, and ones like it in other insurance policies, create a duty to confer and cooperate (sometimes referred to as voluntary payment provisions). Rather, the Plan Proponents disagree with the Insurers on the appropriate remedy for violation of that duty. In the context of finding that the Insurers have standing to object to confirmation, this Court has recognized that an insurer's contractual right to cooperation and control is distinct from an insurer's right to assert a defense to coverage; however, that does not resolve the precise issue now before the Court. The issue is whether the Joint Plan's alleged violation of that duty should be a bar to confirmation or should be preserved as a defense in the coverage action.

The Plan Proponents argue that the Joint Plan does not determine the Insurers' liability and that their coverage defenses are unaffected by the Joint Plan. To further support that position, the

13

Plan Proponents have amended the insurance neutrality provisions to make that point clearer[2]. They argue that "no contractual right to defend against a putative breach of the voluntary payments provisions can be abrogated by confirmation of the Joint Plan." *Plan Proponents objection* at 93.

Notwithstanding that language, the Insurers argue that the Joint Plan violates their contractual rights by giving the Plan Trustee the sole authority to litigate and settle claims against the Plan Trust. *Joint Plan* § 7.2 ("[O]nly the Plan Trustee shall have the authority to contest Asbestos Personal Injury Claims and Asbestos Property Damage Claims and litigate to judgment, settle or withdraw such objection."). The Insurers argument is that the violation of these contractual rights render the Joint Plan unconfirmable based on the established principle that a debtor must accept a contract's burdens as well as benefits. *See, e.g.,* In re Fleming Co., Inc., 499 F.3d 300, 308 (3d Cir. 2007) ("If [a debtor] accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other.") The Plan Proponents counter that the insurance contracts are being accepted *cum onere* and that the Plan Trust will be bound by the cooperation clause and consent to settle provisions of the insurance contracts to the same extent as the Debtors. They further argue that it is the province of the state court in the current (or future) coverage action to determine if the Plan Trust failed to fulfill those obligations thereby providing the Insurers with a possible defense to coverage. The Court must agree. The Court understands that a defense to coverage is not coextensive with a right to direct the litigation from the start. But if the Joint Plan is proposing to leave the terms of the insurance contracts intact and simply transfer the contracts to the Plan Trust (a result permitted by § 1123), the Court does not find that to be a barrier

---

[2]Since the Plan Proponents are no longer seeking confirmation of the Joint Plan, a final determination of whether the "insurance neutrality" language is sufficient to achieve the stated aim of leaving the Insurers' rights unaffected must abide an examination of the precise language that is used in the final plan.

to confirmation. The Court fails to see how the risk that the Debtors might violate the cooperation and control provisions of the insurance contracts (which the Insurers allege the Debtors did by entering into the Claimant Agreement) is materially different from the risk that the Plan Trust might violate those same provisions when the Plan Trust becomes bound by them. The remedy for the Insurers remains the same - failure to abide by the terms of the policy may give rise to a defense to coverage. The argument that the Insurers contracted to deal with the Debtors and not the Plan Trust is unavailing, since § 1123(a)(5) authorizes the transfer to the Plan Trust.

The Court might be persuaded to reach a different result if it were convinced that the contract rights at issue could be adequately protected only by equitable remedies such as an injunction or rescission; however, previous rulings in the coverage litigation demonstrate otherwise. In the coverage action, the state court rejected an application by one of the Debtors' insurers for a restraining order that would have prevented Congoleum from entering into the Claimant Agreement in anticipation of filing its pre-packaged bankruptcy petition. Congoleum Co. v. ACE American Insurance Co., Order, Slip Op. MID-L-8901-01 (Law Div. N.J. April 29, 2003). Judge Epstein ordered Congoleum to provide its insurer with notice and information regarding future settlement demands, but - significantly for this case - he did not bar Congoleum from entering into additional settlements. The rationale underlying that decision was presumably that the insurer did not have a right to stop all settlements that occurred without their permission, but merely had the right to deny coverage if it could be established that the claims were settled in violation of the insurer's policies. This Court finds that rationale to be consistent with the elementary principal of equity that a suit in equity cannot lie where there is an adequate legal remedy. *See, e.g.,* Stolt-Nielson, S.A. v. United States, 442 F.3d 177 (3d Cir. 2006). The Court is not convinced that a defense to coverage is an inadequate legal remedy. *See, e.g.,* New Jersey Eye Center, P.A. v. Princeton Ins. Co., 394 N.J.

Super. 557, 570 (App. Div. 2007) ("the insured must avoid independent action which will contravene any of the essential terms of the policy; compliance with such provisions is a condition precedent to recovery under the policy and their breach can cause a forfeiture of coverage.")  The Insurers are not concerned about settlement without their permission on moral grounds, they are concerned that it will result in a settlement for a higher amount.  At the end of the day, the Insurers concerns are about money.  Money is the bailiwick of courts of law, not equity.  If this Court were to allow the Insurers' alleged contractual right to control settlements to stand as an objection to confirmation, it would be tantamount to issuing an injunction against confirmation - an inappropriate result when there is a remedy at law available.

The Court also finds that would be an inappropriate result based on the intent of Congress in adopting a trust/injunction mechanism to enable companies to deal with their asbestos liabilities. That intent would be frustrated if the mechanisms described by § 524(g)(2)(B)(ii)(V)[3] could not be used in cases where the primary assets are insurance assets.  The right to control the defense of claims is present in most insurance policies.  Therefore, in insurance-reliant cases, no uniform system of claims valuation could hope to be achieved if various different insurers all had the ultimate right to determine how much would be paid on any individual asbestos claim.  The Plan Trust would lose the ability to fulfill its statutorily mandated function of ensuring that similar present and future claims are treated in substantially the same manner.  *See*, 11 U.S.C. § 524(g)(2)(B)(ii)(III) (to approve a § 524(g) trust the court must determine that "pursuit of such

---

[3]That section provides that: "the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner."  11 U.S.C. § 524(g).

demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands ....")

The Insurers insist that the Joint Plan cannot be confirmed because it would result in the loss of a "distinct and valuable right" - the right to participate in or control the defense of a claim[4]. *Travelers' and St. Paul's Reply Brief* at 19. While the Bankruptcy Code is not a license to trample on all non-debtors' rights, instances are legion in which "distinct and valuable" rights of non-debtors are lost or redefined in a bankruptcy case. As the Supreme Court has noted in a different context, Congress through the Bankruptcy Code has "reshaped debtor and creditor rights in marked departure from state law." Associates Commercial Corp. v. Rash, 520 U.S. 953, 964 (1997).

The next objection is that the Joint Plan eliminates the Insurers' right to object to claims pursuant to § 502(a). This is a variant on the previous argument that the Insurers are losing their contractual right to object to the payment of claims. The Plan Proponents do not address this issue.

This argument, like the contractual rights argument, also has the problem that it is seemingly at odds with the intent of Congress in drafting § 524(g). Moreover, the use of § 502(a) to circumvent the trust mechanism and have each individual claim estimated by the bankruptcy court under the guise of an objection to claims presents a further difficulty because the underlying claims at issue here are tort claims. Bankruptcy courts are not authorized to try personal injury tort claims. 28 U.S.C. § 157(b)(5). Depending on the level of objection raised to an asbestos tort claim, resolution by the bankruptcy court may run afoul of that prohibition. Since the Court cannot

---

[4]This Court recognizes that such a right has been recognized as distinct in the non-bankruptcy context. *See, e.g.,* Costley v. State Farm Fire and Cas. Co., 894 S.W.2d, 386 (Tex. Ct. App. 1994)("Although [the insurer] might avoid liability under the contract by raising [the insured's] failure to cooperate as a defense to any action brought to recover under the policy, it would still have lost the valuable right to participate in the trial determining the [liability] of its insured as well as requiring yet another lawsuit.").

determine in advance whether all claim objections would implicate the jurisdictional limitation, summary judgment must be denied on that sub-issue.

The final objection is that the Joint Plan impairs the right of non-settling insurers to contribution from settling insurers. The Court finds that to be a manufactured issue. It has not been demonstrated that the setoff that is provided for in the Joint Plan, § 11.5(e), is worthless because if a non-settling insurer has no liability to the Plan Trust, then no right to contribution from a Settling Insurer would arise.

Accordingly, the Court finds in favor of the Plan Proponents on their cross-motion for summary judgment on this issue.

## C. Whether the Joint Plan complies with Sections 524(g)(2)(B)(i)(II)-(III) of the Bankruptcy Code with respect to the funding of the Plan Trust and its majority ownership of the Debtors

The Joint Plan provides that 50.1% of the shares of new common stock in Reorganized Congoleum will be contributed to the Plan Trust. In addition, the Joint Plan contains a Put/Call Agreement that would, in all likelihood, result in the Bondholders purchasing that stock within 60 to 90 days of the effective date for either $5.25 million of $7.5 million. The issue is whether the Put/Call Agreement complies with § 524(g)(2)(B)(i)(II)-(III).

Subsequent to this Court issuing its June 5, 2008 opinion, the Plan Proponents have submitted a term sheet to the Court that outlines the parameters of a future plan of reorganization that would contain a Put Option but eliminate the Call Option. Given that development, it would be inappropriate for the Court to rule on the acceptability of the Put/Call Agreement. *See, e.g.,* U.S. Nat. Bank of Oregon v. Independent Ins. Agents of America, Inc., 508 U.S. 439, 446 (1993)("The exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy," and "a federal court [lacks] the power to render advisory opinions.") (quoting Preiser

v. Newkirk, 422 U.S. 395, 401 (1975)).

It is important to note, however, that the reasoning in this Court's summary judgment opinion on the Tenth Modified Plan of Reorganization is equally applicable here. For a plan of reorganization to be confirmable, it is not enough to have mere technical compliance with the trust funding requirements of § 524(g)(2)(B)(i)(II)-(III). Equally important to the Court's ultimate determination is whether any proposed plan is "fair and equitable" under § 524(g)(4)(B)(ii) and is proposed in good faith under § 1129(a)(3). Those remain questions for another day. In the meantime, the Court will deny summary judgment on the Put/Call issue unless and until it is squarely raised in its current guise.

## Conclusion

The Court has already found that the Joint Plan currently before the Court is not confirmable as a matter of law. Although the Plan Proponents met with somewhat more success on these supplemental issues, nothing in this Supplemental Opinion alters the Court's initial conclusion that the Joint Plan is unconfirmable. No additional Order is necessary. The parties are free, however, to use the analysis in this Supplemental Opinion when crafting or negotiating their final plan proposal.

*/s/ Kathryn C. Ferguson*
KATHRYN C. FERGUSON
US Bankruptcy Judge

Dated: September 2, 2008